1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8                  EASTERN DISTRICT OF CALIFORNIA

9

10   ALFREDO PROVENCIO,              Case No. 1:15-cv-01327-LJO-MJS (HC)

11            Petitioner,            **FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**

12        v.

13   SHAWN HATTON, Warden            **(ECF NO. 1)**

14            Respondent.            **THIRTY (30) DAY OBJECTION DEADLINE**

15

16

17

18        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

19   corpus under 28 U.S.C. § 2254. Shawn Hatton, Warden of Correctional Training Facility,

20   is hereby substituted as the proper named respondent pursuant to Rule 25(d) of the

21   Federal Rules of Civil Procedure. Respondent is represented by Lewis Albert Martinez of

22   the Office of the California Attorney General.

23        The petition raises the following claims: (1) portions of Petitioner's interview with

24   police should have been suppressed pursuant to MIranda; (2) instructional error resulted

25   in confusion as to the applicable state of mind for the offense of continuous sexual

26   abuse of a minor; and (3) there was insufficient evidence to support a finding that

27   Petitioner caused great bodily harm to the victim. (ECF No. 1.)

28

As discussed below, the undersigned recommends the petition be denied.

**I.     Procedural History**

Petitioner is in the custody of the California Department of Corrections and Rehabilitation pursuant to the September 10, 2012 judgment of the Kings County Superior Court, imposing a term of fifty years to life for continuous sexual abuse of a child, with allegations that Petitioner inflicted great bodily harm on the victim and had a prior "strike" conviction. (Lodged Doc. 1 at 243-44.) Petitioner also was convicted of exhibiting lewd material to a minor in a separate judgment. (Lodged Doc. 1 at 242.)

On April 3, 2014, the California Court of Appeal, Fifth Appellate District, reversed the judgment for exhibiting lewd material to a minor but otherwise affirmed. On June 11, 2014, the California Supreme Court denied Petitioner's petition for review. (Lodged Doc. 17).

On August 31, 2015, Petitioner filed the instant petition for writ of habeas corpus. (ECF No. 1.) On October 30, 2015, Respondent filed an answer. (ECF No. 16.) Petitioner filed no traverse. The matter is submitted.

**II.     Factual Background**

The following facts are taken from the Fifth District Court of Appeal's April 3, 2014 opinion. They and are presumed correct. 28 U.S.C. § 2254(e)(1).

> ***The Information***
>
> The information originally contained 23 counts. The trial court granted the prosecution's motion to dismiss five of the counts before the matter was submitted to the jury. The jury considered 16 counts of molestation related to five different incidents described by the victim. Specifically, there were six counts charging Provencio with violating section 288, subdivision (a), and separate counts alleging Provencio violated each of the following sections once: sections 269, subdivision (a)(1), (3), (4), (5), 288, subdivision (b)(1), 288a, subdivision (c)(1), (2)(B), 286, subdivision (c)(2)(B), 261, subdivision (a)(2), and 289, subdivision (a)(1)(B).
>
> In the alternative, the information charged Provencio with continuous sexual abuse of a child, in violation of section

2

288.5, subdivision (a). Finally, Provencio was charged with exhibiting harmful material to a child, in violation of section 288.2, subdivision (a).

The information also alleged two enhancements. Several counts alleged Provencio personally inflicted bodily harm as defined in section 667.61, subdivision (a). The second enhancement alleged Provencio had suffered a prior conviction that constituted a strike within the meaning of section 667, subdivisions (b) through (i).

### *The Testimony*

The victim (Victim) testified she was 14 years old at the time of trial. Her first sexual encounter with Provencio occurred shortly after she and her family moved into an apartment with him when she was approximately seven years old. The family had purchased an air mattress for camping, and Victim wanted to sleep on it in the living room. Sometime during the night Provencio joined her on the air mattress. Victim woke up in the middle of the night and discovered Provencio touching her vagina underneath her underwear. After a few minutes, Victim rolled onto her side, got up, went to the bathroom, and then joined her mother in bed.

Approximately one year later, Victim and Provencio were in the bedroom he shared with Victim's mother. The two were playing around and making jokes. Suddenly, Provencio stated he wanted to "nail [Victim] so bad." He then started touching her body, including her breasts and genital area. She attempted to push him away, but he would not stop. He stopped when Victim's mother returned home.

After this second incident, the molestation happened more frequently and eventually escalated. Victim was able to relate an incident that occurred when she and her brother spent the night in a tent in their backyard. She awoke in the middle of the night to find Provencio next to her removing her pants. He rubbed her vagina with his fingers and placed his finger inside it. He also rubbed his penis against her vagina and then inserted his penis into her vagina. When he finished, Provencio left the tent.

The events of molestation continued and eventually escalated into nightly abuse. Provencio started telling Victim what he wanted her to do to him and how to do it. His requests included instructing her to copulate him orally. He also would copulate her orally. She explained that whenever

she wanted money to buy things, he would demand a sexual encounter before he would give it to her.

Victim testified Provencio sodomized her "almost every time." She claimed that every time he sodomized her it was painful. A few times after being sodomized, she would bleed, and it would hurt to walk for a few days.

Victim also testified to incidents where her arms were bruised by Provencio. She explained that she attempted to get away from him when he wanted to sodomize her. He would grab her arms and push her back onto the bed. The force used by him to restrain her left bruises. This type of incident occurred often.

Two nights before Victim reported the molestations to the police, Provencio had intercourse with her. She did not report the molestations for a long time because she was scared. Provencio told her that if she ever told anyone about the molestation, he or his friends would hurt her, her brother, and her mother. He also would take things away from her if she made him angry and threatened that the family would end up on the streets if he was arrested. She finally confided in her godmother because Provencio began verbally and physically abusing her brother and mother.

Finally, Victim described an occasion when she watched pornography with Provencio. She was watching television when he called her over to see something on his computer, which turned out to be pornographic videos. She tried to walk away, but he pulled her back and made her watch the videos. She remembered the girls in the video were dressed in provocative Valentine's Day or Christmas Day themed clothes.

Victim described a bottle of lubricant used by Provencio and described where he stored the bottle. Investigating officers located the bottle of lubricant in the location described by Victim. Investigating officers also found black underwear in Victim's bedroom in the location she described after her last encounter with Provencio.

DNA testing of a biological stain found on the underwear located two male contributors. Analysis of the major contributor was consistent with Provencio and other males who were related to Provencio. In terms of probability, the sequence obtained from the sample would occur in one in

every 942 African–Americans, one in every 704 Caucasians, and one in every 572 Hispanics.

Lucy Sager, the nurse examiner for the Sexual Assault Response Team, examined Victim. Sager found bruising on the back of Victim's upper right thigh, although she could not determine if the bruising was related to a sexual assault. She noted redness and tenderness in one part of the vaginal area that was the result of an object rubbing the area, possibly caused by a sexual assault. In another part of the vaginal area she observed a laceration of recent origin. She observed scarring to the perineum, indicating there had been some type of trauma, possibly multiple traumas, resulting in multiple healed injuries. She observed redness and tenderness in the anal area. There also were bruises on Victim's buttocks. These injuries were consistent with the history described by Victim, although the injuries could have been caused by a mechanism other than a sexual assault.

Robert Waggle, an investigator for the district attorney's office, examined various electronic devices related to Provencio. The first was a memory stick that was removed from a portable gaming device. Waggle found two files that contained adult pornographic videos. On a flash drive Waggle found several pornographic video files, including one that suggested a Valentine's Day themed video and another that contained a Christmas Day themed video. Other files depicted a boy sleeping with his friend's mother, girl-on-girl videos, and a girl sleeping with her friend's brother. Waggle described the videos as "Complete hardcore porn." An external hard drive contained a password-protected file entitled "O.K. Raiders" that contained adult pornographic videos.

Provencio testified in his defense. He denied ever having sexual contact with Victim and explained some of the incidents in a manner that did not involve sexual contact. He also explained the pornography found on his computer paraphernalia, but he denied ever having shown it to Victim. Outside the presence of the jury, Provencio admitted his prior strike conviction.

### Closing Arguments

The prosecution suggested the jury focus on the continuous sexual abuse of a child allegation. If the jury found Provencio guilty of that count, it could ignore the individual charges. The prosecution then asserted there was more than ample

evidence that Provencio committed more than three acts of molestation over a period in excess of three months.

Defense counsel argued Victim fabricated the charges, essentially parroting the testimony she had heard on a television news program. In addition, defense counsel argued there was insufficient evidence Victim had suffered bodily harm within the meaning of the enhancement.

### *Verdict and Sentencing*

The jury accepted the prosecutor's suggestion and found Provencio guilty of continuous sexual abuse of a child, in violation of section 288.5, subdivision (a), and exhibiting harmful material to a child, in violation of section 288.2, subdivision (a). The jury also found true the allegation that Provencio had inflicted bodily harm within the meaning of section 667.61, subdivision (a).

The trial court sentenced Provencio to a term of 50 years to life for the continuous sexual abuse of a child count. The term for this count starts with a triad of six, 12, or 16 years. This term was increased to 25 years to life pursuant to section 667.61 because the jury concluded Provencio personally inflicted bodily harm on Victim, who was under the age of 14. (Id., subds. (a), (c)(9), (d)(7).) The term was then doubled because Provencio admitted he had a prior conviction that constituted a strike within the meaning of section 667, subdivisions (b) through (i). The sentence on the remaining count was imposed concurrently

People v. Provencio, No. F065755, 2014 WL 1327984, at *1–3 (Cal. Ct. App. Apr. 3, 2014)

## III. Jurisdiction and Venue

Relief by way of a writ of habeas corpus extends to a prisoner under a judgment of a state court if the custody violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered a violation of his rights as guaranteed by the U.S. Constitution. Petitioner was convicted and sentenced in this district. 28 U.S.C. § 2241(d); 2254(a). The Court concludes that it has jurisdiction over the petition and that venue is proper.

## IV. Applicable Law

The petition was filed after April 24, 1996 and is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). Under AEDPA, federal habeas corpus relief is available for any claim decided on the merits in state court proceedings if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

### A. Standard of Review

A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-06). "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that even a general standard may be applied in an unreasonable manner" Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).

1     A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id. at 75-76 (quoting Williams, 529 U.S. at 409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). "[A]n unreasonable application of federal law is different from an incorrect application of federal law." Harrington v. Richter 562 U.S. 86, 101 (2011) (citing Williams, 529 U.S. at 410) (emphasis in original). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations." Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).

**B.    Requirement of Prejudicial Error**

In general, habeas relief may only be granted if the constitutional error complained of was prejudicial. That is, it must have had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require a showing of prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, claims alleging ineffective assistance of counsel are analyzed under the Strickland prejudice standard; courts do not engage in a separate analysis applying the Brecht standard. Strickland v. Washington, 466 U.S. 668 (1984); Avila v. Galaza, 297 F.3d 911, 918, n.7 (2002); Musalin v. Lamarque, 555 F.3d 830, 834 (9th Cir. 2009).

## C.    Deference to State Court Decisions

"[S]tate courts are the principal forum for asserting constitutional challenges to state convictions," not merely a "preliminary step for a later federal habeas proceeding." Richter, 562 U.S. at 103. Whether the state court decision is reasoned and explained, or merely a summary denial, the approach to evaluating unreasonableness under § 2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Id. at 102. In other words:

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 103. Thus, the Court may issue the writ only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Id. at 102.

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). Thus, the court will "look through" a summary denial to the last reasoned decision of the state court. Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198 (9th Cir. 2006). Furthermore, the district court may review a habeas claim, even where the state court's reasoning is entirely unexplained. Richter, 562 U.S. at 98. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id. ("This Court now holds and

1 reconfirms that § 2254(d) does not require a state court to give reasons before its
2 decision can be deemed to have been 'adjudicated on the merits.'").

3 **V.    Review of Petition**

4    **A.    Claim One: <u>Miranda</u>**

5        As described in greater detail below, Petitioner participated in a recorded
6 interview with police. While much of the interview was uneventful, the interviewing
7 detective eventually accused Petitioner of molesting the victim. During this accusation,
8 Petitioner nodded his head repeatedly. Immediately thereafter, he requested counsel
9 and the interview was terminated. The prosecution was permitted to introduce at trial
10 evidence of the nodding through the testimony of the interviewing detective. Petitioner
11 argues that the nodding was part of his exercise of his <u>Miranda</u> rights and should have
12 been suppressed.

13            **1.    State Court Decision**

14        The California Supreme Court summarily denied this claim. Accordingly, the Court
15 "looks through" the Supreme Court's decision to the reasoned decision of the Fifth
16 District Court of Appeal. <u>See Ylst</u>, 501 U.S. at 804. The Court of Appeal rejected
17 Petitioner's claim as follows:

18            Provencio was interviewed by the police after Victim reported
19            the molestation. This interview was recorded with audio and
               video equipment. Much of the interview was not relevant to
20            the proceedings. After about one hour, however, the
               interrogating detective accused Provencio of molesting
21            Victim. Seconds after the accusation, Provencio invoked his
               right to counsel and the interview was terminated.
22

23            When the interrogating detective accused Provencio of
               molesting Victim, Provencio nodded his head. The
24            prosecution contended these movements were an admission
               and elicited this information from the interviewing detective at
25            trial. Provencio objected to this testimony, asserting he was in
               custody, and the nods were part of his invocation of his
26            constitutional rights pursuant to <u>Miranda</u>. The trial court
               overruled the objection after an Evidence Code section 402
27            hearing and after viewing the videotape of the interview.
               Defense counsel, for tactical reasons, then decided to

28

introduce the entire invocation process to put the nods of Provencio's head into context.

Provencio contends the trial court erred when it permitted the prosecution to elicit evidence that he nodded his head, relying on the same two grounds as urged in the trial court. "'In reviewing constitutional claims of this nature, it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' [Citation.]" (<u>People v. Thomas</u> (2011) 51 Cal.4th 449, 476.)

Provencio's first argument is that he was in custody at the time he nodded his head. "'"An interrogation is custodial, for purposes of requiring advisements under <u>Miranda</u>, when "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." [Citations.] Whether a person is in custody is an objective test; the pertinent question being whether the person was formally arrested or subject to a restraint on freedom of movement of the degree associated with a formal arrest. [Citation.]' " (<u>People v. Linton</u> (2013) 56 Cal.4th 1146, 1167.)

The only witness to testify at the Evidence Code section 402 hearing was the detective who interrogated Provencio. He testified Provencio was contacted in the front yard of his home as he returned from work. The detective identified himself as a police officer and was displaying a badge and weapon. He asked Provencio if he would be willing to come to the police department to discuss "an allegation." Provencio agreed and was transported in a police car to the police station. He was not placed in handcuffs.

The interrogating detective met Provencio in the interrogation room at the police station for the interview, which was recorded.[FN3] At the beginning of the interview, the detective advised Provencio he was not under arrest and that he was free to leave at any time. The two then engaged in a conversation that was not adversarial, nor which suggested Provencio could not leave. This tone continued until the detective left the room for a short time. Up to this point, Provencio concedes he was not in custody for <u>Miranda</u> purposes.

11

[FN3: We have reviewed the recording of the interview.]

When the detective returned to the room, he was accompanied by a second detective who took a seat near the back wall, away from the door. At this point the interrogating detective accused Provencio of molesting Victim, with the accompanying nodding of the head by Provencio. The issue is whether the change in tenor and the presence of the second detective converted this consensual interview into a custodial interrogation. We conclude that Provencio was not in custody.

Comparison of the facts in this case to those in <u>People v. Moore</u> (2011) 51 Cal.4th 386 (<u>Moore</u>) explains our conclusion. Moore's neighbor was murdered, and it appeared to investigating officers that Moore had knowledge relevant to the crime. Moore initially was interviewed in a patrol car because his trailer did not have heat or electricity. Although the detectives were armed and in uniform, and the doors to the patrol car were closed and locked, the Supreme Court concluded Moore was not detained. The Supreme Court observed that Moore was asked to give a statement as a percipient witness, and he readily agreed to do so. (<u>Id.</u> at p. 396.)

At the end of the interview in the patrol car, the investigating officer requested Moore come to the police station to give a detailed statement. Although somewhat reluctant, Moore agreed to do so. He was driven to the police station in a patrol car. During the ride Moore conversed with the police officer driving him, and there was some discussion related to the investigation, generally instigated by Moore. The Supreme Court concluded Moore was not in custody during the drive. "[The officer] did not interrogate defendant during the ride; defendant was at the least an equal partner in initiating and maintaining the conversation, which ranged widely in subject matter. On arriving at the station, defendant sought confirmation that the officers only wanted a statement and would drive him home afterward. Receiving that confirmation, he again agreed to give the statement. Nothing indicates defendant thought he was not free to leave during the ride to the station, and no reasonable person would have thought so in these circumstances." (<u>Moore</u>, <u>supra</u>, 51 Cal.4th at pp. 397–398.)

Once Moore arrived at the police station, he was placed in an interview room to give a recorded statement. Moore was not

12

handcuffed or otherwise restrained. Two detectives were in the room when Moore was interviewed. Moore was informed he was not under arrest, was free to leave, and was at the station to give a statement as a percipient witness.

The detectives then began to ask Moore about the victim, her family, and any other relevant information he may have had about the murder. Both detectives joined in questioning Moore. Eventually, the detectives asked Moore about his past drug use and prior arrests. Moore was asked if he had burglarized the victim's residence. Detectives then began asking questions suggesting Moore was in the victim's residence before the murder and might have direct knowledge about the murder. Moore answered each of these questions in the negative, but he admitted he carried a stick with him as a walking aid.

Up to this point, it appears Moore had not been informed the victim had been murdered. When he was informed, Moore denied any involvement. The questioning continued along a line suggesting Moore had murdered the victim, including questions about a knife Moore carried with him. Detectives asked for permission to search Moore's trailer to find the knife, but Moore refused, stating he would retrieve the knife for the detectives when he returned home.

Detectives continued to question Moore in a manner that suggested they suspected him of murdering the victim, perhaps when she surprised him while he was burglarizing the residence. Moore denied the accusation and asked if he was under arrest. The detectives stated he was not under arrest. Moore asked for a ride home, but the detectives continued questioning Moore about the murder. Moore continued to deny any involvement in the murder and again asked for a ride home. The detectives then instructed Moore to return to his seat and asked if he would volunteer his clothes to be checked for evidence. Moore agreed to this proposition. Moore again asked for a ride home while waiting for someone to collect his clothes. The detectives told Moore they would give him a ride home after they collected his clothes but continued to question him about his possible involvement in the murder. Moore's clothes were collected and his body photographed, with the detectives pointing out scratches and bruises to be photographed. Moore again was asked if he was involved in the victim's death and again he denied any involvement. The detectives instructed Moore to sit down and informed him he would be taken home as soon as a patrol officer could be found to give him a ride.

13

The questioning continued about various topics and then the detectives left the room. One detective testified that at this point he was informed that evidence from the crime scene connected Moore to the murder, including property from the victim's residence recovered from Moore's trailer. This detective then returned to the interview room and asked Moore if he would allow technicians to swab his hands. Moore refused and demanded a ride home. He refused a further request to stay at the station voluntarily. The detective then told Moore he could not go home and informed him of his constitutional rights pursuant to <u>Miranda</u>.

"We agree with the trial court that the sheriff's station interview did not, in its entirety, constitute custodial interrogation. As already discussed, defendant, the last person known to have seen the victim and obviously an important witness, was asked—and freely agreed—to come to the station to give a statement. In context, [the detective's] statement that 'we have to do [it] now' rather than the next day clearly referred only to the importance of getting information promptly and did not convey a command that defendant go to the station. On arriving at the station, defendant asked whether, and was again assured, he was there only to give a statement. Once in the interview room at the station, [the detective] expressly told defendant he was not under arrest and was free to leave. Defendant said he understood. Defendant was not handcuffed or otherwise restrained, and there was no evidence the interview room door was locked against his leaving. The interview was fairly long—one hour 45 minutes— but not, as a whole, particularly intense or confrontational. The interview focused, initially, on defendant's encounter with [the victim], the missing fence boards, and information defendant might have had about the man he reported seeing in [the victim's] backyard or others connected with [the victim's family]. For a substantial period, while defendant filled in his previous statements with details, the questioning did not convey any suspicion of defendant or skepticism about his statements.

"After a while, to be sure, the detectives interjected some more accusatory and skeptical questions, with [one detective] asking defendant straight out, 'Did you burglarize the house?' and, later, urging him to begin being 'honest with me.' The detectives' questions

14

about defendant's prior arrests, drug use, need for money, and carrying of a knife and other weapons on the day of the crimes conveyed their suspicion of defendant's possible involvement. But Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' [Citation.] While the nature of the police questioning is relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody. [Citation.] At least until defendant first asked to be taken home and his request was not granted, a reasonable person in defendant's circumstances would have believed, despite indications of police skepticism, that he was not under arrest and was free to terminate the interview and leave if he chose to do so." (Moore, supra, 51 Cal.4th at pp. 402–403.)

As Provencio concedes, nothing that occurred prior to the break converted this voluntary interview into a custodial interrogation. Undoubtedly, after the break, the detective's accusatory statement (I know you molested Victim, I am just trying to determine why) certainly conveyed to Provencio that at a minimum he was a suspect. That statement, in and of itself, however, did not convert the interview into a custodial interrogation. Provencio voluntarily came to the police station to be interviewed. He was told he could leave at any time and there was no apparent restriction on his ability to do so, even though he did not try to do so. He was not placed in handcuffs, nor did the door appear to be locked.

Nor did the presence of the second detective convert the interview into a custodial interrogation. The second detective entered the interview room after the break, sat down, and did not appear to participate in any aspect of the interview until after Provencio requested an attorney. No reasonable person immediately would believe he or she was in custody simply because two detectives entered the room instead of one detective.

As stated in Moore, police expressions of suspicion without other evidence of restraint on a person's freedom of movement do not necessarily convert a voluntary interview into a custodial interrogation. (Moore, supra, 51 Cal.4th at p. 403.) The complete absence of restraint on Provencio's

15

movement, along with police assurances, would not cause a reasonable person to believe he or she was under arrest and could not terminate the interview and leave. Accordingly, as in <u>Moore</u>, we conclude Provencio was not in custody and <u>Miranda</u> warnings were not necessary.

Provencio's second argument is that his nodding of the head was part of his request for an attorney and therefore inadmissible. We do not agree.

We have reviewed the recording of the interview and conclude there are only two possible interpretations of the nods of the head by Provencio. One interpretation is an acknowledgment that the charges were true as suggested by the prosecution. The more likely interpretation is that Provencio was acknowledging what the detective was saying, not agreeing with the statements. Even though Provencio requested an attorney shortly after nodding his head, we cannot see any logical path that would lead to the conclusion that the nods of the head were a request for counsel.

Our analysis means the nodding of the head is admissible and its import is for the jury to decide. We thus reject this argument along with the first one and conclude the trial court's ruling was correct.

<u>People v. Provencio</u>, No. F065755, 2014 WL 1327984, at *3–7 (Cal. Ct. App. Apr. 3, 2014).

### 2.   Applicable Law

In <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966), the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Thus, "suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation. <u>Thompson v. Keohane</u>, 516 U.S. 99, 107 (1995); <u>Miranda</u>, 384 U.S. at 473-74. Once <u>Miranda</u> warnings have been given, "all questioning

16

1  must cease" if a suspect makes a clear and unambiguous statement invoking his
2  constitutional rights. <u>Smith v. Illinois</u>, 469 U.S. 91, 98 (1984).

3      Miranda warnings are required only when a suspect interrogated by the police is
4  "in custody." <u>Thompson</u>, 516 U.S. at 102. Custodial interrogation means "questioning
5  initiated by law enforcement officers after a person has been taken into custody or
6  otherwise deprived of his freedom of action in any significant way." <u>Miranda</u>, 384 U.S. at
7  444. The relevant question is whether a "reasonable person [would] have felt he or she
8  was not at liberty to terminate the interrogation and leave." <u>Thompson</u>, 516 U.S. at 112.
9  Resolving this question requires consideration of the following two inquiries: (1) what
10 were the overall circumstances surrounding the interrogation; and (2) given those
11 circumstances, would a reasonable person in the suspect's situation have felt free to
12 terminate the interrogation and leave. <u>J.D.B. v. North Carolina</u>, 564 U.S. 261, 270
13 (2011). This is an objective inquiry. Thus, "subjective views harbored by either the
14 interrogating officers or the person being questioned are irrelevant." <u>Id.</u> (internal
15 quotation marks and citation omitted).

16     In order for an accused's statement, made during custodial interrogation, to be
17 admissible at trial, police must have given the accused a <u>Miranda</u> warning. <u>See Miranda</u>,
18 384 U.S. at 471. "If that condition is established, the court can proceed to consider
19 whether there has been an express or implied waiver of Miranda rights." <u>Berghuis v.</u>
20 <u>Thompkins</u>, 560 U.S. 370, 388 (2010) (citation omitted).

21        **3.**    **Analysis**

22     The dispositive issue is whether Petitioner was in custody for purposes of <u>Miranda</u>
23 at the time he nodded his head in response to the interviewing detective's statements.
24 The Court concludes that the state court's determination that Petitioner was not in
25 custody was not an unreasonable application of Supreme Court precedent. <u>See</u>
26 <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004).

27
28

First, there appears to be no dispute that Petitioner was not in custody at the outset of the interview. Petitioner came voluntarily to the police station. He was not handcuffed or restrained in any way. He was expressly told that he was not under arrest and was free to leave. The interview proceeded conversationally for approximately one hour. At no time during that period did the interviewing detective pressure Petitioner to continue the interview, nor did Petitioner express a desire to leave.[1] See Oregon v. Mathiason, 429 U.S. 492, 435 (1977) (per curiam) (holding that suspect was not in custody where he had come voluntarily to police station, was informed he was not under arrest, and was allowed to leave at end of interview).

Thus, the question becomes whether something changed when the interviewing detective re-entered the interview room with his colleague, such that a reasonable person would no longer have felt that he was free to leave. This inquiry presents a closer call. The officers arrested Petitioner immediately upon his termination of the interview, suggesting that Petitioner may no longer have been free to leave once both officers entered the room. However, the mere fact that the officers planned to arrest Petitioner does not trigger the need for Miranda warnings. Oregon v. Mathiason, 429 U.S. 492, 495 (1977); see also Berkemer v. McCarty, 468 U.S. 420, 442 (1984) ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time.") Rather, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer, 468 U.S. at 442.

Here, the detective's accusations against Petitioner are relevant to the custody inquiry, but only to the extent they would affect how a reasonable person in Petitioner's position would gauge the restraint on his freedom to leave:

> Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and

---

[1] The Court has reviewed the videotaped interview, which was lodged with the Court on September 22, 2017.

> pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case. In sum, an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

Stansbury v. California, 511 U.S. 318, 325 (1994).

The Court of Appeal's determination that Petitioner was not in custody at the time he nodded his head was not objectively unreasonable in light of the overall circumstances surrounding the interrogation. Again, Petitioner clearly was informed at the beginning of the interview that he was free to leave and, while that fact was not reconfirmed when the detectives re-entered the room, neither was it contradicted. Neither detective blocked the door or attempted to physically or verbally dissuade Petitioner from exiting. Petitioner was not handcuffed or otherwise restrained. The tenor of the interview remained conversational despite the accusations. Furthermore, the remainder of the interview was brief. In effect, it ended immediately once Petitioner was informed of the accusations against him. In light of all these circumstances, a fairminded jurist could conclude that Petitioner was not in custody at the time he nodded his head. The state court's determination that the nodding need not be suppressed pursuant to Miranda was not objectively unreasonable.

Furthermore, even assuming Petitioner was in custody and the nodding should be suppressed, any error in admitting this evidence did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 629. Having reviewed the video interview, the Court agrees with the Court of Appeals that it would be a stretch to construe Petitioner's nodding as an admission of guilt, despite the prosecutor's argument in this regard. At the very least, a fariminded jurist could conclude

that Petitioner "was acknowledging what the detective was saying, not agreeing with the statements."

Based on the foregoing, Petitioner is not entitled to relief on this claim.

**B.    Claim Two: Conflicting Instructions on Intent**

Petitioner claims that the jury was given conflicting instructions on the intent required to find Petitioner guilty of the offense of continuous sexual abuse of a child.

### 1.    State Court Decision

The Fifth District Court of Appeal rejected Petitioner's claim as follows:

> Provencio was charged with continuous sexual abuse of a child, in violation of section 288.5, subdivision (a). The trial court instructed the jury on this count pursuant to CALCRIM No. 1120. This instruction informed the jury that to convict Provencio of this offense, the jury must find (1) Provencio lived with Victim, (2) he engaged in three or more acts of substantial sexual conduct or lewd and lascivious conduct with Victim, (3) three or more months passed between the first and last acts, and (4) Victim was under the age of 14 at the time of the acts. The instruction also defined "substantial sexual conduct" and "lewd and lascivious conduct" for the jury.
>
> Provencio's argument focuses on the element of intent required to commit a lewd and lascivious act. CALCRIM No. 1120 informed the jury that "Lewd or lascivious conduct is any willful touching of a child accomplished with the intent to sexually arouse the perpetrator or the child." (Italics added.)
>
> The trial court also instructed the jury with CALCRIM No. 252. The relevant portion of this instruction informed the jury that continuous sexual abuse of a child required a general criminal intent and also informed the jury that to find Provencio guilty of this crime, he "must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime." Provencio asserts these two instructions conflict on the issue of intent. We disagree.
>
> The error in Provencio's argument is that he confuses the intent required to violate section 288.5 with the intent required for one of the elements the jury must find exists to convict a

20

defendant of violating section 288.5. To violate section 288.5, a defendant must commit each of the elements as explained in CALCRIM No. 1120: (1) the defendant must live in the same home as the victim, (2) the defendant must engage in three or more acts of substantial sexual conduct with the victim or lewd and lascivious acts with the victim, (3) the length of time between the first act and the last act must be three or more months, and (4) the victim must be under the age of 14 when the acts occur. The intent required to violate each of these elements is referred to as general intent, i.e., the intent to commit the acts without any further intent required.

The second element of the crime required the jury to find Provencio committed three or more lewd and lascivious acts with Victim or three or more acts of substantial sexual conduct with Victim. If the jury focused on whether Provencio committed three or more lewd and lascivious acts with Victim, the jury would have to find that those acts were committed with the specific intent to arouse either Provencio or Victim sexually. (People v. Whitham (1995) 38 Cal.App.4th 1282, 1293.) On the other hand, if the jury focused on substantial sexual conduct when considering the second element of the crime, there was no requirement that the conduct be committed with the specific intent to arouse either Provencio or Victim sexually. The mere act of oral copulation, sodomy, insertion of an object in the vagina of either the perpetrator or the victim, or masturbation of either the victim or the perpetrator constitutes substantial sexual conduct within the meaning of section 288.5. (Whitham, at p. 1293.) The instructions provided to the jury adequately explained these concepts. There was no error.

People v. Provencio, No. F065755, 2014 WL 1327984, at *7 (Cal. Ct. App. Apr. 3, 2014)

### 3. Analysis

The California Court of Appeal found that the trial court properly instructed the jury on the elements of the offense, and that Petitioner's argument was based on an incorrect understanding of the underlying law. This determination is a matter of state substantive law that does not provide a basis for federal habeas relief. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991) (holding that a challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus

21

proceedings); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (alleged error in interpretation or application of state law not a basis for federal habeas relief).

Instead, a federal court's inquiry on habeas review is limited to whether the challenged jury instruction "violated some right which was guaranteed to the defendant by the Fourteenth Amendment." <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973). "[N]ot every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." <u>Id.</u> On federal review, the pertinent question is whether the challenged instruction "so infused the trial with unfairness as to deny due process of law." <u>Estelle</u>, 502 U.S. at 75. Relevant to this inquiry is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." <u>Id.</u> (quoting <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990)).

Here, the state court determined that the instructions properly instructed the jury on the substantive elements of state criminal law. There is no basis to conclude that the jury applied the instructions in a way that violated the constitution. Petitioner is not entitled to relief on this claim.

### C.    Claim Three: Insufficient Evidence

Petitioner styles this claim as a challenge to the sufficiency of the evidence regarding the bodily harm enhancement. However, upon closer inspection, the petition appears to ask that the Court define the degree of injury required to constitute "bodily harm" under California law, or to interpret "bodily harm" more favorably than did the Court of Appeal.

### 1.    State Court Decision

The Fifth District Court of Appeal rejected this claim as follows:

**Standard of Review**

To assess the evidence's sufficiency, we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. (<u>People v. Maury</u> (2003) 30 Cal.4th 342, 403.) The record must disclose

substantial evidence to support the verdict, i.e., evidence that is reasonable, credible, and of solid value, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (Id. at p. 396.) In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury reasonably could have deduced from the evidence. (People v. Boyer (2006) 38 Cal.4th 412, 480.) "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" (Maury, at p. 403.) A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict. (People v. Bolin (1998) 18 Cal.4th 297, 331.)

***Bodily Harm Enhancement***

The jury found true an allegation that Provencio personally inflicted bodily harm on Victim within the meaning of section 667.61. This section provides that a defendant who commits a sex offense that is listed in subdivision (c) of the section will be subject to a sentence of 25 years to life if specific circumstances listed in subdivisions (d) and (e) are found to be true. Subdivision (a) of the section provides that for the enhanced sentence to apply, the jury must find true either one or more of the circumstances listed in subdivision (d) or two or more of the circumstances listed in subdivision (e). Continuous sexual abuse of a child is one of the listed sex offenses (§ 667.61, subd. (c)(9)), and personal infliction of bodily harm on a victim under 14 years of age is one of the circumstances listed in subdivision (d) (§ 667.61, subd. (d)(7)).

"Bodily harm" is defined in subdivision (k) of section 667.61 as "any substantial physical injury resulting from the use of force that is more than the force necessary to commit an offense specified in subdivision (c)." Provencio argues the jury's finding that he inflicted bodily harm on Victim was not supported by substantial evidence, and thus the enhanced sentence must be vacated and he must be sentenced pursuant to the provisions of section 288.5.

The testimony related to the injuries sustained by Victim was limited to that of Victim and Sager, the nurse who conducted the forensic examination. Victim testified that when Provencio sodomized her, it was painful. She had pain when she walked for a few days, and there was some bleeding after the event. She also testified that on one occasion she attempted to escape Provencio when he was molesting her, but he grabbed her by the arms and threw her to the bed. This event left bruises on her arms.

Sager testified she found some bruising on Victim during her examination, but she could not determine if it was related to an assault or not. She also noted tenderness and a laceration in the vaginal area that could be related to a sexual assault. Similarly, she noted redness and tenderness in the anal area that could be related to a sexual assault. Finally, she observed scarring to the perineum, indicating some type of trauma that could be related to a sexual assault.

While this testimony was not overwhelming, we conclude it was sufficient to support the jury's finding that Provencio inflicted substantial physical injury on Victim. While there are no cases directly on point, we find guidance in section 12022.7. This section, in part, enhances a sentence if the defendant "inflicts great bodily injury on any person other than an accomplice" during the commission of a felony. (Id., subd. (a).) The term "great bodily injury" is defined by the statute as "a significant or substantial physical injury." (Id., subd. (f).) Thus, the Legislature had defined "great bodily injury" in section 12022.7 using essentially the same term as it used to define "bodily harm" in section 667.61. Accordingly, we find instructive those cases that have interpreted the term "great bodily injury" as used in section 12022.7.

In People v. Washington (2012) 210 Cal.App.4th 1042, 1047, the court noted that a finding of great bodily injury will be sustained when there is "some physical pain or damage, such as lacerations, bruises, or abrasions." The Washington court cited People v. Jaramillo (1979) 98 Cal.App.3d 830, 836–837 (Jaramillo) and People v. Sanchez (1982) 131 Cal.App.3d 718, 733 (Sanchez) to support its statement.

In Jaramillo the defendant struck her young daughters with a wooden stick 18 to 20 inches long and about one inch in diameter. One daughter "suffered multiple contusions over various portions of her body and the injuries caused swelling and left severe discoloration on parts of her body. The injuries were visible the day after infliction to at least two lay

24

persons.... Further, there was evidence that [the daughter] suffered pain as a result of her injuries because a day later she had a 'look of anguish' on her face and she flinched or turned away from a simple guiding touch on the shoulder ... and [the daughter stated] 'it hurt' as [she] walked to the nurse's office." (Jaramillo, supra, 98 Cal.App.3d at p. 836.) Concluding the issue "might be close," the appellate court concluded there were sufficient facts to support the finding. (Ibid.)

In Sanchez, this court described the victim's injuries as "multiple abrasions and lacerations. She had one long scratch diagonally across her back and numerous bruises and small lacerations on her neck. She had a serious swelling and bruising of her right eye and a markedly swollen left cheek." (Sanchez, supra, 131 Cal.App.3d at p. 733.) Relying primarily on Jaramillo, we held this evidence was sufficient to support a great bodily injury enhancement.

Additional guidance is found in two Supreme Court cases. In People v. Escobar (1992) 3 Cal.4th 740, the defendant raped the victim, causing her to suffer "multiple abrasions to her thighs, knees, hips and elbows. Several photographs introduced at trial revealed raw and bloody asphalt burns and bruises over various parts of her body. [The victim] testified that her neck hurt so badly after the attack that she could not move it. Vaginal pain prevented her from walking without impairment for more than a week. A police employee testified that when [the victim] reported for an interview six days after the assault, she appeared injured, walked with a very heavy limp, and required the assistance of two friends, one on each side, to help her." (Id. at p. 744.) The Supreme Court, in overruling one of its earlier cases,[FN4] held the evidence of "extensive bruises and abrasions over the victim's legs, knees and elbows, injury to her neck and soreness in her vaginal area of such severity that it significantly impaired her ability to walk" was sufficient evidence to sustain the great bodily injury finding. (Escobar, at p. 750.)

[FN4: People v. Caudillo (1978) 21 Cal.3d 562.]

In People v. Cross (2008) 45 Cal.4th 58, the defendant had repeated sexual intercourse with his stepdaughter, resulting in her becoming pregnant. The defendant encouraged the victim to get an abortion, which she did with the defendant's assistance. The Supreme Court explained that "Proof that a victim's bodily injury is 'great'—that is, significant or substantial within the meaning of section 12022.7—is

commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury. [Citations.] Thus, when victims of unlawful sexual conduct experience physical injury and accompanying pain beyond that 'ordinarily experienced' by victims of like crimes [citation], such additional, 'gratuitous injury' will support a finding of great bodily injury [citation]." (Id. at p. 66.) The Supreme Court held the evidence that the 13–year–old victim became pregnant was sufficient evidence to support the great bodily injury finding. (Ibid.)

These cases convince us that Victim suffered bodily harm within the meaning of section 667.61. Victim testified she suffered bruises on her arms as a result of Provencio forcing her to the bed so he could sodomize her. She also described rectal bleeding and pain that lasted for a few days as a result of Provencio sodomizing her. While the description of these injuries was sparse, the bleeding and excessive pain described by Victim is comparable to the injuries suffered by the victim in Escobar. When combined with the bruising suffered by Victim, we conclude there was a bare minimum of evidence sufficient to support the jury's verdict.

Provencio, 2014 WL 1327984, at *8-10.

### 2. Analysis

To the extent Petitioner disputes the Court of Appeal's interpretation of "substantial physical injury," his claim presents a question of state law that is not subject to federal review. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010) (per curiam) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."); Estelle v. McGuire, 502 U.S. 62, 71-72 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Middleton, 768 F.2d at 1085 (alleged error in interpretation or application of state law not a basis for federal habeas relief).

To the extent Petitioner argues that the evidence was insufficient even under the standard articulated by the Court of Appeal, his claim is reviewable. The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable

doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1 (2011).

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, 132 S.Ct. 2060, 2064 (2012) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant relief, the federal habeas court must find that the decision of the state court rejecting an insufficiency of the evidence claim reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13. Thus, when a federal habeas court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957, 964

(9th Cir. 2011). The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Chein</u>, 373 F.3d at 983.

Here, the state court determined that "bodily harm" requires "some physical pain or damage, such as lacerations, bruises, or abrasions." <u>Provencio</u>, 2014 WL 1327984, at *9. The complainant testified that she suffered pain for several days, bleeding, and bruising as a result of the abuse. This evidence is sufficient to support a finding of guilt beyond a reasonable doubt. Therefore, the state court's rejection of the claim was not objectively unreasonable. Petitioner is not entitled to relief on this claim.

**VI.     Conclusion and Recommendation**

Based on the foregoing, it is HEREBY RECOMMENDED that the petition for writ of habeas corpus be DENIED.

The findings and recommendation are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **thirty** (30) days after being served with the findings and recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 839 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   <u>October 31, 2017</u>          <u>/s/ *Michael J. Seng*</u>
                                         UNITED STATES MAGISTRATE JUDGE